HARRY G. MASSER AND EVELYN H. MASSER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61921.    Filed June 27, 1958.

*Mac Asbill, Jr., Esq.,* and *James V. Heffernan, Esq.,* for the petitioners.

*Douglas W. Argue, Esq.,* and *Thomas N. Chambers, Esq.,* for the respondent.

Respondent determined a deficiency in petitioners' income tax for the year 1951 of $4,739.94. The sole issue in this case is the applicability of section 112 (f) of the Internal Revenue Code of 1939 to the

disposition of a terminal building and land used in petitioners' trucking business.

The parties have filed herein a stipulation of facts and we incorporate herein by this reference the stipulation, together with the exhibits attached thereto.

The petitioners, Harry G. Masser and Evelyn H. Masser, are husband and wife with principal residence in Blue Ridge Summit, Pennsylvania. They used the calendar year for reporting Federal income taxes and filed a timely Federal income tax return for the calendar year 1951 with the district director of internal revenue at Baltimore, Maryland.

Harry G. Masser, hereinafter referred to as petitioner (his wife is a party solely by reason of filing a joint Federal income tax return for 1951), operated an interstate trucking business as a sole proprietorship under the name of Masser Motor Express during 1950 and through June 30, 1951, after which date the business was conducted by a corporation which had been incorporated on April 23, 1951, under the name of Accelerated Transport-Pony Express, Inc., hereinafter referred to as Accelerated. During these years the business maintained and operated terminal distribution facilities in Philadelphia, Pennsylvania; Washington, D. C.; Hagerstown, Maryland; Harrisburg, Pennsylvania; Winchester, Virginia; Union City, New Jersey; Clarksburg, West Virginia; Pittsburgh, Pennsylvania; Wheeling, West Virginia; Huntington, West Virginia; and Charleston, West Virginia. The principal office of Masser Motor Express, hereinafter referred to as Express, was in Hagerstown, Maryland. The petitioner's trucking operation may be compared to a wheel, the hub of which was located at Hagerstown. Freight was routed to Hagerstown where it would be transferred to tractor-trailer units destined for the individual terminals.

The petitioner owned the terminal building in Union City and also owned eight lots directly across the street from the terminal building and an apartment house approximately 20 blocks from the terminal building. Both the terminal building and the lots were acquired in 1943 at one time through the same real estate agent but from different vendors. Petitioner would not have bought one property without the other. They were intended to be used and were used by petitioner together as one economic unit, i. e., the terminal distribution point for the business in the New York-New Jersey metropolitan area. In the trucking business it is accepted practice to have adequate parking space adjacent to the terminal building. The building was a garagetype structure 100 by 100 feet. One-third of this building was subleased as a garage facility to Consolidated Laundries Corporation. The lots were used for the parking of trucks and

equipment operating in and out of the terminal building across the street. The apartment building was acquired in 1947 and at that time petitioner intended to use it as sleeping quarters for his road drivers, but facilities for this purpose were constructed in the terminal building itself and the apartment was never used to quarter the drivers.

The parking lots covered an area of 100 by 200 feet. These lots could accommodate approximately 40 trailers and in 1951 there were normally 20 to 25 trailers per day using this area. When a road truck arrived at the Union City terminal the freight was unloaded and transferred directly to city delivery trucks in order to prevent the stacking of freight on the loading platform which would have resulted in freight damage, increased labor costs, and general obstruction of the loading area. A semitrailer containing freight to be transferred to several delivery trucks would frequently be unloaded in steps and moved back and forth between the terminal building and the parking lots. It was necessary on many occasions to unload these trailers in steps because the petitioner lacked a sufficient number of city delivery trucks to handle all of the freight at one unloading.

This terminal building was adequate for the company's business operation in 1951. A cancellation of the sublease to Consolidated Laundries would have permitted a substantial alteration of the building and would have increased the terminal's capacity to handle freight. The Union City trucking operation could have continued even without alteration of the terminal building by the combined use of the building and the parking area.

In a letter dated March 28, 1950, the Housing Authority in Union City, New Jersey, sought to acquire petitioner's parking lots in order to build low-cost housing developments. Petitioner at first declined to sell the lots on the grounds that these parking lots were vitally important and essential to petitioner's business, and that if the parking lots were sold there would be no place to park the truck equipment and, consequently, it would be necessary to sell the terminal building. In a letter dated April 5, 1950, the Housing Authority threatened to start proceedings for the condemnation of the parking lots. Petitioner sought the advice of an attorney who advised that petitioner had no choice other than to sell the parking lots, inasmuch as the Housing Authority had power to condemn the property by exercising its right of eminent domain.

As a result of the threat of condemnation and the attorney's advice to sell, the petitioner did sell the eight lots constituting the parking lots to the Housing Authority on November 15, 1950. The Housing Authority paid the total of $16,500 for the eight lots, which was $500 more than the original offer. The Housing Authority's representative thought that a purchaser could be found who would pay $30,000 for the terminal building. The petitioner, through his at-

torney, made no demand for compensation for consequential damage to the terminal building. At no time did the Housing Authority threaten to condemn this terminal building which petitioner sold on April 19, 1951, to Consolidated Laundries for $42,500. This sale was made only because of the involuntary sale of the parking lots and because of petitioner's prudent judgment that the operation of terminal distribution facilities in Union City would be impractical without adjacent parking space.

The only adequate lots available for parking facilities in the Union City area were 1½ miles away from the Union City terminal building. It was determined that these facilities could not be used economically by petitioner in view of the problems caused by the distance from the terminal. Their use would have resulted in greatly increased labor costs, increased hazards of traffic accidents and thefts of freight, delays in deliveries which would have antagonized customers, and complications in traffic management. After the sale of the lots to the Housing Authority, the Authority gave petitioner permission to use them until the middle of 1951. There was one vacant lot available near the terminal building that would accommodate two or three tractor-trailer units. This was totally inadequate for petitioner's needs. However, temporarily and pending the acquisition and completion of new terminal facilities, petitioner used this lot and the neighboring streets for the parking of his trucks for a short time after the lots sold to the Housing Authority ceased to be used for this purpose. This led to great difficulties, particularly with the local police.

On February 1, 1951, petitioner purchased new terminal facilities, including adequate parking space, in Weehawken, New Jersey, for $50,000. A new terminal building was constructed and an old building was remodeled at a total cost of $75,687.71. The new Weehawken terminal facilities replaced the Union City terminal facilities and were similarly used in petitioner's interstate trucking business. The new terminal facilities covered an area of 43,000 square feet, of which 10,000 were subleased and used by the people from whom the purchase of the property was made. Petitioner held the new terminal facilities on the date of disposition of the Union City terminal.

Petitioner's trucking business was organized in 1931 and has grown from a 1-truck operation to a business utilizing over 150 units of road and city equipment and having gross receipts of over $4,800,000 per year. The business had grown from 10 per cent to 50 per cent in each year. In 1951 petitioner was actively negotiating for the purchase of Cumberland Motor Express, a $380,000 interstate trucking business operating in and through Maryland, Pennsylvania, West Virginia, and the District of Columbia.

In July 1951 the newly formed corporation, Accelerated Transport-Pony Express, Inc., assumed the assets and liabilities of Express, and J. Edward Davey, president of the newly formed corporation, took over the management of petitioner's business.

The sole proprietorship Masser Motor Express and its successor, Accelerated Transport-Pony Express, Inc., reported the following gross receipts and net profit or loss:

| Masser Motor Express | | |
| --- | --- | --- |
| Year | Gross receipts | Net profit (or loss) |
| 1949 | $1,666,723.29 | 2 $6,932.58 |
| 1950 | 2,091,458.92 | (6,648.45) |
| 1951 1 | 1,121,122.77 | 55,784.86 |

| Accelerated Transport-Pony Express, Inc. | | |
| --- | --- | --- |
| Year | Gross receipts | Net profit (or loss) |
| 1951 1 | $1,013,682.02 | ($1,472.16) |
| 1952 | 2,284,658.77 | 105,824.40 |
| 1953 | 2,417,403.83 | 103,782.47 |

1 Half year.
2 As adjusted based upon audit by the Internal Revenue Service.

The apartment house in Union City was transferred on July 1, 1951, to the newly formed corporation as business property of Express. It was sold in 1952 for $10,500 and the gain was reported on the 1952 corporation income tax return of Accelerated. The sale of the apartment building was voluntary and was not treated as an involuntary conversion under the nonrecognition provision of section 112 (f) of the 1939 Code. During the years 1951 through 1953, Accelerated improved or acquired new terminal facilities in Cumberland, Maryland; Washington, D. C.; Harrisburg, Pennsylvania; Frederick, Maryland; Charleston, West Virginia; Clarksburg, West Virginia; Parkersburg, West Virginia; and Philadelphia, Pennsylvania. The terminal in Winchester was abandoned due to improved facilities in Hagerstown.

In petitioner's 1951 Federal income tax return he elected to treat the gain both from the sale of the parking lots and from the sale of the terminal building as nonrecognized gain under section 112 (f). Respondent issued a statutory notice of deficiency determining a deficiency in the amount of $4,739.94, all of which was attributable to the disallowance of the taxpayer's treatment of gain from the sale of the terminal building.

OPINION.

KERN, *Judge:* The question presented by this case is whether section 112 (f) (1) of the Internal Revenue Code of 1939 [1] is applicable to the facts here before us. Those facts may be summarized as follows: Petitioner, who operated an interstate trucking business, bought at one time two pieces of property situated across a street from each other, one improved by a building (including offices and a bunkhouse) to be used for the loading and unloading of trucks, and the other to be used as space in which the trucks could be parked pending their loading and unloading. The two pieces of property were used together as an economic unit, constituting petitioner's terminal facilities serving the New York metropolitan area. It is conceded that the parking area was "involuntarily converted" by petitioner as the result of the threat or imminence of condemnation. If petitioner retained the improved property, the closest available space for a parking area would have been approximately a mile and a half away. For petitioner to have operated his truck terminal with his parking area that far from the building where the loading and unloading of his trucks took place and where his offices were located would have been physically possible, but would have been economically impractical because (1) it would have entailed considerable direct expense in connection with the additional labor required, (2) it would have resulted in increasing the hazards of traffic accidents and cargo thefts, (3) it would have resulted in such delays in deliveries as to have affected adversely petitioner's customer relations, and (4) it would have presented complicated problems in connection with traffic management. Because of the involuntary sale of the parking area as a result of the threat of condemnation, petitioner decided in good faith and in the exercise of prudent business judgment to sell the improved property also and to use the proceeds of both properties to buy property in the same general locality suitable for similar use as a truck terminal. Under these circumstances, was the sale of the improved property an involuntary conversion as a result of the threat or imminence of condemnation?

We are not aware of any authorities directly in point as to the question presented, and the legislative history of section 112 (f) and its predecessor sections is not helpful.

Bearing in mind two basic principles, that "[t]axation * * * is eminently practical," *Tyler* v. *United States*, 281 U. S. 497, 503, and that a relief provision "should be liberally construed to effectuate its

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(f) INVOLUNTARY CONVERSION.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

(1) CONVERSION INTO SIMILAR PROPERTY.—Into property similar or related in service or use to the property so converted, no gain shall be recognized.

purpose," *Massillon-Cleveland-Akron Sign Co.*, 15 T. C. 79, 83, we are of the opinion that when two pieces of property, practically adjacent to each other, were acquired for the purpose of being used and were used in a taxpayer's business as an economic unit, when one of the pieces of property was involuntarily sold as a result of the threat of condemnation, when it was apparent that the continuation of the business on the remaining piece of property was impractical, and as a result of the involuntary sale of the one piece of property the taxpayer in the exercise of good business judgment sold the other piece of property, and when the proceeds of both sales were expended in the acquisition of property similar to the economic unit consisting of the two properties sold, the transaction, considered as a whole, constitutes an involuntary conversion of one economic property unit within the meaning of section 112 (f).

*Decision will be entered for petitioners.*