OPINION Oppee, Judge: When the land acquired by petitioner for use as the site of a large store in downtown San Francisco was sold under threat of condemnation and the proceeds invested in similar properties for identical use with the purpose of replacing the original site, we think petitioner properly elected nonrecognition[1] of the gain on the sale of the original site pursuant to section 1033, I.E.C. 1954. The basic purpose of section 1033(a) (3) (A) undoubtedly is to allow the taxpayer to replace his property * * * without realizing gain where he is compelled to give up such property because of circumstances beyond his control. S. E. Ponticos, Inc., 40 T.C. 60 (1963). Initially, respondent contends that the property was not “compulsorily or involuntarily converted” since it was not sold under a threat of condemnation and, in any event, was not sold to the condemning authority. Respondent concedes that the city’s garage proposal was impending and unavoidable.[2] The only realistic alternatives available to petitioner were to have the city condemn the property, or itself sell to someone who could in turn satisfy the city’s requirements.[3] A sale to private interests as a result of condemnation, actual or threatened, did not render inapplicable the provisions of the predecessor of section 1033. Harry G. Masser, 30 T.C. 741 (1958), acq. 1959-2 C.B. 5. The involuntary conversion of petitioner’s property seems to us inescapable. In the alternative, respondent objects to the application of section 1033 because, with the exception of Market Street, no property was purchased “for the purpose of replacing the property so converted.” Respondent insists that “petitioner was constantly engaged in a search for new and/or larger store locations in order to expand.” In the same breath, he “submits that to satisfy the Code, there must be an acquisition of property which would not have been purchased but for the involuntary conversion” and that “The * * * thing accomplished by the conversion of the Ellis & O’Farrell Street property was to release cash which would otherwise have been tied up.” We think this sequence of statements eliminates any doubt that the purpose of the acquisitions specified was to replace the old property. Certainly petitioner could not have obtained “new and * * * larger store locations” and could not “expand” if at the same time it did not at least replace property of which it was deprived; [4] and the freeing of the cash upon the involuntary conversion of Ellis and O’Farrell was, on respondent’s own hypothesis, the necessary prerequisite for the purchase of future sites. It seems to us to follow that the store sites, for which the Ellis and O’Farrell cash became directly or indirectly available, were clearly acquired upon threat of condemnation for the purpose of replacing the lost property. Respondent's further contention is that the replacement properties were not “similar or related in service or use to the property so converted,” because Ellis and O’Farrell had been rented as a parking lot before and after its purchase by petitioner, and petitioner had never actually devoted the property to store use.[5] Since, as has been amply shown, the only realistic purpose for the purchase of Ellis and O’Farrell was as a store site, this argument turns on whether petitioner is to be denied section 1033 treatment because it never has been able to devote property purchased for a specific purpose to that use. There can be no question here of petitioner’s purpose with regard to the converted property. It intended to build a large retail establishment. “When the accomplishment of the objective was thwarted by the exercise of the power of eminent domain, petitioner took the normal steps to be expected nnder the circumstances. It bought another piece of property suitable to its purposes.” Gaynor News Co., 22 T.C. 1172, 1177 (1954). Respondent attempts to limit the holding of Gaynor News Co. to “changes in use which are actually in process, or which are to occur immediately.” We think this is too narrow an interpretation. Petitioner incontrovertibly established its purposes with reference to Ellis and O’Farrell, the necessary postponement of the intended action, the temporary steps taken to assure its position, and the final abandonment of the project when it became hopeless. [T]he facts in the present case establish clear identity of intended function, use, and purpose of both the old and the new property and, therefore, * * * the statutory test of “similar or related in service or use” is here fully met. [Gaynor News Co., supra at 1179.] Respondent’s reliance on Lynchburg National Bank & Trust Co., 20 T.C. 670 (1953), affd. 208 F. 2d 757 (C.A. 4, 1953), seems to us misplaced. There, the property destroyed by fire was not acquired as a proposed addition to the taxpayer’s bank. The intention was to demolish it in any event. Only the land was to be used and that was not destroyed. Unlike Gaynor News Co., supra, and the present case, which are otherwise similar, the replacement property consisting of an addition to the bank’s own building was not at all related in use to the rented shoe store and restaurant which were lost by the fire. On the present record, the service and use of Ellis and O’Farrell as a store site for petitioner was not only similar and related but identical with the service and use of the replacement properties. Finally, respondent objects to the purchase of Market in replacement of Ellis and O’Farrell since Market was improved property and Ellis and O’Farrell was unimproved. Sec. 1.1033(a)-2(9) (i), Income Tax Regs. But— The involuntary conversion of land held vacant for an indefinite time and purpose, and the investment of the proceeds of the conversion thereof in improved land, presents an issue differing widely from the situation of an involuntary conversion of land in the process of being fitted for use for a particular purpose and the investment of the proceeds in property consisting of land and partially usable improvements designed to be used for the identical purpose. Gaynor News Co., supra at 1178. Ellis and O’Farrell was intended to be a store site, and an allocable portion of the purchase price of Market was for land to be used as a store site.[6] ■ Respondent has not argued that because one site in San Francisco was partly replaced by a number of sites in several cities in other parts of the country,[7] the gain does not qualify for treatment under section 1083. It is clear that several properties may replace one larger property, Wilmore S. S. Co. v. Commissioner, 78 F. 2d 667 (C.A. 2, 1935), reversing on other grounds 30 B.T.A. 866 (1934). And in Clifton Investment Co., 36 T.C. 569 (1961), affd. 312 F. 2d 719, 573 (C.A. 6, 1963), we said: The fact that the property sold was located in Cincinnati and the property acquired was located in New York City, we think, makes no difference. During this period, and in addition to the more distant properties specified as replacements, petitioner made several purchases of store sites in California.[8] All but one of these, including Market, were purchases of existing leased stores, and the sixth was to provide a new store site in Fresno. Since the properties purchased are concededly store sites, they also would have had the requisite similarity for purposes of section 1033. Respondent, however, raises no issue as to the geographical distance of the replacement properties, and we see no reason here to interfere with the list originally designated by petitioner. The parties are in agreement that only those properties which petitioner originally considered as such should be employed in specifying the replacement property. The administrative convenience of such a rule is obvious. The designated properties here, being adequate to support petitioner’s position, need not be further examined; but we intimate no opinion whether, in some other proceeding where the appropriateness of different property as a replacement is incontrovertible, the permissibility of its substitution may not be properly considered. The involuntary conversion section requires that petitioner be deprived of useful property by outside forces, Harry G. Masser, supra; that it acquire other property which shall be similar or related in service or use, cf. S. E. Ponticos, Inc., supra; and that its purpose in so doing shall be replacement of the property of which it has been deprived. Gaynor News Co., supra. We think, in its dealings with respect to Ellis and O’Farrell, petitioner has adequately met all of the statutory requirements. Decision will he entered for the petitioner. SEC. 1033. INVOLUNTARX CONVERSIONS. (a) General Rule. — If property (as a result of Its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) Is compulsorily or involuntarily converted— ****••• (3) * * * the gain (if any) shall be recognized except * * * (A) * * * If the taxpayer * * * for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted * * * at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion * * * exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * * (B) Period Within Which Property Must Be Replaced. — The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending— (i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, * * * Income Tax Regs. Sec. 1.1033(a)-2(e) (2). All of the details in connection with an involuntary conversion of property at a gain (including those relating to the replacement of the converted property, or a decision not to replace, or the expiration of the period for replacement) shall be reported in the return for the taxable year or years in which any of such gain is realized. An election to have such gain recognized only to the extent provided * * * [by sec. 1033 (a) (3) (A)] shall be made by including such gain in gross income for such year or years only to such extent. If, at the time of filing such a return, the period within which the converted property must be replaced has expired, or if such an election is not desired, the gain should be included in gross income for such year or years in the regular manner. A failure to so include such gain in gross income in the regular manner shall be deemed to be an election by the taxpayer to have such gain recognized only to the extent provided * * * [by sec. 1033(a) (3) (A)] even though the details in connection with the conversion are not reported in such return. * * * He says in his brief: “It would only be in the event that private development was not forthcoming that the City would proceed to acquire by condemnation for the stated purpose. * * *” This distinguishes the present case from Creative Solutions, Inc. (Formerly Alprodeo, Inc.) v. United States, (N.D. Tex. 1962) -F. Supp.-, on appeal (C.A. 5, June 19, 1962). The effect of the involuntary conversion proceeds upon petitioner’s fiscal policy was explained by the controller of the company in the following manner: “During that period of time the company was engaged in a program of modernizing and bringing up to date its store properties. We were straining every effort to bring our properties into a more competitive position by installing a self-service facility and by other modernization proceedings in the various stores. To that end we were investing all that we could invest in an attempt to bring ourselves back to a more competitive position. When it came time, the tax section urged the properties committee to take advantage of the Involuntary conversion provisions of the Code, and they had to either defer wanted improvements or use this money obtained from the Ellis and O’Farrell sale to buy the new locations.” Respondent objects to only one of the replacement properties as not being a store site. That is the New Orleans plot purchased as the site for a stockroom in conjunction with a plan to convert the stockroom of its existing store into sales area. Since a stockroom is an integral part of every store, and since the proposed Ellis and O’Farrell store would have included a stockroom area, we have found the properties to be “similar or related in service or use" despite the descriptive labels which the parties have assigned. Even the improvements on Market were only partially usable since extensive alteration was required. Petitioner does not attempt to avail itself of the value of the useful improvements as part of its replacement cost as was permitted in Gaynor New Co., 22 T.C. 1172, and we, accordingly, express no opinion in that regard. We have found that: “Petitioner considered * * * [specified] properties as purchased in replacement of Ellis and O’Farrell and in August 1958, in the course of the audit of its 1956 income tax return, so advised the internal revenue service.” This was actually the first opportunity available to petitioner in view of the provisions of section 1033(a) (3) (B), and the extension of the time therein prescribed. Date of acquisition Location Land cost 4-30-53 Market Street, San Francisco, Calif.. 12-17-54 Eiverside, Calif.... 6-30-55 San Jose, Calif__-7-23-56 San Pedro, Calif_ 1-31-57 Fresno, Calif.__ 4-23-58 San Bernardino, Calif__ $755,139 118,904 220,070 179,232 301,809 1,873,957