S. & B. Realty Company, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Samuel Goldberg and Bess Goldberg, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Dockets Nos. 3833–68, 3834–68.    Filed April 27, 1970.

*Joseph J. Kaplan* and *Edward A. Rothschild,* for the petitioners.
*Frederick W. Krieg,* for the respondent.

864

868

OPINION

### Issue 1. Threat or Imminence of Condemnation

Section 1033 (a) provides in part:

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

and the proceeds of the conversion are invested in property "similar or related in service or use to the converted property" within the period specified by section 1033 (a) (3) (B) ; then "gain shall be recognized only to the extent that the amount realized * * * exceeds the cost of such other property * * *."

In the case at bar the respondent concedes that the cash proceeds of the sale by petitioner were invested in property "similar or related in service or use" to that sold and further concedes that the proceeds were invested within the statutory period required by section 1033. Therefore, the sole question that concerns us, as regards this issue, is whether petitioner sold his property under threat or imminence of condemnation. We hold that he did.

There is no substantive dispute as the facts involved herein. Petitioner had actual notice that his property was conservable property within the urban renewal area.[3] As we indicated in our Findings of Fact, there can be little doubt that, by the early part of 1961, petitioner was made aware of the fact that his property was situated in an area selected for urban renewal. Nor is there any doubt that by the end of 1962 the Urban Renewal Agency was vested with the authority to effect a condemnation of his property. Then, in early 1963 petitioner contacted Kelly Lewis of the Urban Renewal Agency and was told by Lewis of the four alternatives facing him. In May or early June of 1963 petitioner was made aware of the fact that the Urban Renewal Agency was considering the acquisition of his property when he was informed, by Lewis, that the property had been appraised at $62,500. Between June 12 and June 14, 1963, Marjorie Caplan

---

[3] On brief, respondent conceded that petitioner had actual notice by June 14, 1963. In addition, as we set forth above, there is no doubt that petitioner in fact had knowledge at a substantially earlier time.

reiterated petitioner's four alternatives concerning his property; he could: (1) Improve or repair in compliance with the direction of the Urban Renewal Agency; (2) sell to a third party who would have to make the specified repairs; (3) sell to the Agency at a negotiated sales price; (4) do nothing and await condemnation.

On June 14, 1963, petitioner's property was inspected by the Agency in order that the cost and type of repairs could be determined. On June 15, 1963, before the results of the inspection were made known to him, petitioner contracted for the sale of his property.[4] As it happened, the Agency estimated that petitioner's property would require repairs costing approximately $6,782.33, as indicated by its letter dated July 12, 1963. Finally, on July 19, 1963, the property was conveyed to Brown Bros., the purchaser, for an expressed consideration of $70,388.50.

Since we have found that petitioner had actual notice[5] that his property would have been condemned had he done nothing, our inquiry is narrowed to the determination of whether there was a threat or imminence of condemnation at the time of sale or whether threat or imminence was obviated by the above-mentioned alternatives; specifically, the option to retain the property by making improvements.

As a relief provision, section 1033 is to be liberally construed. *John Richard Corp.*, 46 T.C. 41, 44 (1966). In addition, it is well established that the words of revenue acts should, where possible, be interpreted in their ordinary, everyday senses. *Malat* v. *Riddell*, 383 U.S. 569, 571 (1966). With these guides in mind we must determine whether there were facts in the instant case sufficient to constitute a threat.[6]

There was certainly "an indication of something impending" which was undesirable, Webster's Third New International Dictionary (1961 ed.) (definition of threat). In our opinion, had it not been for this sword of Damocles petitioner would not have sold his property.

It is significant that the word "threat" was used in section 1033. This is indicative of the fact that the statute does not require that the possibility of condemnation be reduced to a certainty. Any reasonable construction of the word must recognize the possibility that the impending, undesirable consequence may never occur. The crucial factor is that the petitioner was compelled by this impending consequence to take evasive action.

We have held that a sale to a third party meets the tests of section 1033. See, e.g., *Harry G. Masser*, 30 T.C. 741 (1958) ; *S. H. Kress & Co.*,

---

[4] For purposes of this opinion we will consider June 15, 1963, the date of sale. In his reply brief petitioner raises the argument that July 19, 1963, was the date of sale because he could have rescinded the contract prior to that time. We see no reason, nor has any been offered, why the contract should be considered unenforceable.

[5] Obviously without notice there can be no threat.

[6] Because the statute is worded in the disjunctive, if we find a threat it will be unnecessary to determine if condemnation was imminent.

40 T.C. 142, 153 (1963). In *S. H. Kress & Co.*, *supra*, the taxpayer found itself in a situation markedly similar to the one at bar. In *Kress* the taxpayer was faced with three alternatives: It could build a parking facility, sell its property to a private party willing to build a parking facility, or permit the City of San Francisco to condemn the property for a parking facility. The taxpayer chose to sell its property to a private party. In holding for the taxpayer we did not require it to invest additional funds in constructing a new building. We stated that the only realistic alternatives were sale or condemnation. We do not deem *Kress* distinguishable from the instant case because the operation of a parking facility would have been a departure from Kress' past and contemplated business activities.

On brief respondent seizes upon language in *S. H. Kress & Co.*, *supra* at 153, wherein we stated that the basic purpose of section 1033 is to allow the taxpayer to replace his property without realization [7] of gain "where he is compelled to give up such property because of circumstances beyond his control." When Congress enacted sections 214(a)(12) and 234(a)(14) of the Revenue Act of 1921 (the predecessors of section 1033) it obviously intended to grant a measure of tax relief to those who were, compelled by the specified circumstances, to convert their property into cash. This intended relief should not be abrogated merely because the omnipotent, condemning authority affords the taxpayer the opportunity to retain his property by making an additional investment. Such an opportunity neither assuages the compulsion nor contravenes the intent of Congress.

Further, respondent raises the argument that the petitioner sold his property before the results of the inspection of June 14, 1963, were known to him and that, since the possibility existed that no repairs would be necessary, the petitioner could have retained his property by doing nothing. This argument fails on two grounds. Firstly, as we stated in our Findings of Fact, the possibility that no repairs would be necessary was remote. Secondly, the threat still existed at the time of sale.

Finally, respondent directs our attention to our decision in *C. G. Willis, Inc.*, 41 T.C. 468 (1964), affirmed per curiam 342 F. 2d 996 (C.A. 3, 1965), which he claims, though factually distinct, is illustrative of his position in the instant case. In *Willis* the taxpayer's freighter was severely damaged when it collided with a submerged object. Instead of having the ship repaired the taxpayer sold it and invested the proceeds along with its insurance recovery in a new vessel. We made it clear, at page 475, that the record suggested that the decision to sell was caused by motives other than that arising from the

---

[7] In *S. H. Kress & Co.*, 40 T.C. 142, 153, we used the term "realize" when, perhaps "recognize" would be more appropriate.

damage to the vessel. The taxpayer had made prior efforts to sell the freighter and had "a strong economic incentive, completely unrelated to the damages caused by the collision, to sell the [freighter]." Therefore we found that the sale could not be deemed involuntary within the meaning of section 1033(a). Hence our decision there that the statute was inapplicable where the owner "had a choice of keeping the property or converting or selling it" was rendered in light of a factual background so different as to render the legal conclusion stated therein inapposite.

### Issue 2. Unreasonable Compensation

Section 162(a)(1) provides that a corporation shall be allowed a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." Respondent determined that $3,200 of the $5,000 salary paid by S. & B. to Goldberg was excessive.

The question is one of fact to be determined from all of the facts and circumstances of the particular case. *Boyle Fuel Co.*, 53 T.C. 162, 169 (1969). The burden of proving reasonableness is upon the petitioner. *Botany Worsted Mills* v. *United States*, 278 U.S. 282 (1929). We find that S. & B. has satisfied its burden and shown, by a fair preponderance of the evidence, that compensation was reasonable.

While it is true that S. & B. employed a managing agent it appears that his duties were merely ministerial. It was Goldberg who had responsibility for the success or failure of S. & B.'s business.

As we set forth in our Findings of Fact Goldberg had long experience in the management of rental properties. And he performed valuable services during the year at issue. In general, he supervised all of the activities of the managing agent. In particular, he was responsible for all repairs which would cost more than $25. He inspected the apartment buildings; was available to tenants and received their complaints; was available for conferences with the managing agent concerning repairs and the retention or return of vacating tenants' security deposits; and, he performed various bookkeeping and financial duties. In addition, he had the responsibility of giving final approval of prospective tenants.

In view of the foregoing facts respondent's disallowance of any portion of the $5,000 salary paid Goldberg is unnecessarily parsimonious, to say the least. Moreover, it is totally unrealistic. We hold for S. & B.

### Issue 3. Depreciation Deduction

Due to S. & B.'s concession that the useful lives of certain furnishings; i.e., refrigerators, stoves, and furniture, were 5 years, there are

two questions remaining for decision as to this issue: Firstly, whether respondent erred in its determination that the above-mentioned furnishings had a salvage value of $4,900 during the taxable year ended May 31, 1965; and secondly, whether respondent erred in determining that these furnishings had a cost of $9,100 as opposed to the $15,000 claimed by S. & B. Both of these determinations are necessary for the purpose of computing allowable depreciation during the year in issue. Needless to say that these questions are purely factual and S. & B. has the burden of proof.

As to the proper salvage value, at the time of their purchase the refrigerators and the stoves were from 8 to 12 years old. We think it safe to say that at the end of their 5-year useful lives these appliances would have no salvage value whatsoever. As this time they would range in age from 13 to 17 years. It would, indeed, be a philanthropic purchaser who would give anything at all to obtain these relics. In fact, S. & B. would probably, if it wished to dispose of these liabilities after 5 years, be forced to pay someone to cart them away. We therefore, in accordance with our findings of fact and Income Tax Regs. section 1.167(a)-1(c), find no salvage value.

As to the furniture, the same reasoning is applicable with one exception. We were not informed, at trial, of the age of the furniture although there is every indication that it was used to some extent. At the end of over 5 years it, too, would have little realizable value. We, therefore, hold that at the time of purchase the furniture had an aggregate salvage value of $400.

Concerning the cost of the refrigerators, stoves, and furniture, when Goldberg purchased the apartment buildings no express allocation of part of the purchase price was made to the furnishings. However, the seller furnished records containing a Jefferson County personal property tax assessment according to which the personalty was valued at $15,000. Of this S. & B. allocated $75 for each of 84 refrigerators and 84 stoves as its cost and $240 for each of 10 rooms of furniture. We find these amounts somewhat excessive. The parties have stipulated that the personal property tax assessment was arbitrary and hence we cannot hold those figures to be controlling. Rather, viewing the facts presented at trial we find that in view of the age and type of the refrigerators and stoves their value is $60 per unit. This provides an aggregate cost of $10,080. Concerning the 10 rooms of furniture, due to its used condition, we find an allocable cost of $200 per room; or a total of $2,000.

A further matter involving S. & B. concerns the cost of the Lincoln Apartments and Reeser Place Apartments. The parties have stipulated in the case of S. & B. Realty Co., docket No. 3833-68, that should decision be rendered for petitioners in Samuel and Bess Goldberg,

docket No. 3834–68, i.e., issue 1, then the purchase prices of Lincoln Apartments and Reeser Place Apartments are to be reduced by $28,810.12 and $19,952.89, respectively. We hereby incorporate that stipulation.

*Decisions will be entered under Rule 50.*