ESTATE OF JOHN E. MORRIS, DECEASED, JOHN M. MORRIS, FRANCIS H. MORRIS AND EUGENE GEORGE MORRIS, EXECUTORS, AND MARGARET H. MORRIS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5723–67. Filed January 11, 1971.

*Edward S. Smith*, for the petitioners.
*Louis F. Nicharot*, for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $35,115.10 in the income tax of petitioners for the calendar year 1964. The sole issue presented concerns the applicability of section 1033 [1] when a taxpayer who has received the proceeds from a condemnation of his property dies before replacement of the condemned property can be completely effected.

### FINDINGS OF FACT

All of the facts have been stipulated and are found accordingly.

The petitioners in this case are the Estate of John E. Morris and Margaret H. Morris, the deceased's widow. At the time their petition was filed, the office address of the executors and the residence of Mrs. Morris were in Salisbury, Md. Pursuant to section 6013(a)(3), petitioners timely filed a joint return for the calendar year 1964 with the district director of internal revenue, Baltimore, Md.

The deceased, John E. Morris, and Margaret H. Morris, his wife, owned undivided one-half interests as tenants in common in certain improved real property consisting of the land and buildings thereon located on Calvert Street in Salisbury, Md. (hereinafter the Calvert Street property). The Calvert Street property was leased for commercial purposes.

In the fall of 1960, the Salisbury Planning Commission held public hearings on a proposed "Central Business District Revitalization Plan." Subsequently, in 1961, the mayor and Council of Salisbury formally concurred with the plan. In 1962, a public hearing was held and formal approval was given to a revised "Northside Project Urban Renewal Plan" (hereinafter the Northside Plan). The Calvert Street property was located within the area affected by the Northside Plan, and after these hearings Mr. and Mrs. Morris knew their property would be condemned. Federal approval of the Northside Plan was given in April 1962.

The Calvert Street property was not formally condemned until April 9 and 10, 1964. Damages were set at $338,600. This sum, plus $1,808.35 in interest, was paid to Mr. and Mrs. Morris on May 12, 1964.

In the interval between formal Federal approval of the Northside Plan in April 1962 and the receipt by Mr. and Mrs. Morris of the condemnation proceeds in May 1964, the following steps were taken with regard to the replacement of the Calvert Street property:

(1) In May 1962, the services of Irving M. Footlik & Associates (hereinafter Footlik), a consulting engineering and architectural firm, were requested with regard to replacing the Calvert Street property.

---

[1] All references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

(2) In June and August 1962, surveys of certain real property located at Brown and Naylor Streets in Salisbury (hereinafter the Brown Street property) were obtained.

(3) Throughout the latter months of 1962, extensive consultations were held with Footlik and plans for the replacement facility were discussed.

(4) The Brown Street property was purchased by Mr. and Mrs. Morris as tenants in common in November 1962 with the intent of constructing thereon facilities to replace the Calvert Street property.

(5) After Mr. and Mrs. Morris purchased the Brown Street property, many conferences were held with the general contracting firm of J. Roland Dashiell & Sons, Inc. (hereinafter Dashiell). Dashiell had submitted a budget price to the Morrises based on the Footlik plans.

(6) Between January and April 1964, Dashiell broke ground on the Brown Street property by razing unwanted buildings, cutting the property to grade, and taking soil borings to determine final footings data pursuant to an understanding with the Morrises that it would build the building. On April 1, 1964, based on final drawings, Dashiell quoted a total construction price of $483,413.75, which included work already completed, including razing two buildings, grading, and soil borings.

At the time Mr. and Mrs. Morris received the condemnation proceeds, they were ready to enter a written contract with Dashiell but were waiting for the condemnation award to become final upon the expiration of the 30-day appeal period.

Two days after Mr. and Mrs. Morris received the condemnation proceeds, they purchased $340,000 of General Motors Acceptance Corp. short-term commercial paper. This commercial paper had due dates ranging from 60 to 210 days. The due dates corresponded with the financial requirements of the contemplated construction schedule for the replacement facility.

On May 24, 1964, John E. Morris died suddenly and unexpectedly. His will was admitted to probate on June 1, 1964, by the Orphans' Court of Wicomico County, Md. This will named his three sons as executors and trustees with broad powers.

On August 4, 1964, the sons, as coexecutors under the decedent's will, filed a petition in the Orphans' Court seeking to transfer to the cotrustees under the will the decedent's interest in both the Brown Street property and the condemnation proceeds. The petition stated that such a transfer was necessary in order to proceed with the building plans

for the replacement facility "in the same manner and on the same basis as the deceased and his family had started and intended to continue except for his death." This petition was granted on the same date.

On August 12, 1964, the sons, as trustees under the decedent's will, and Mrs. Morris entered a written contract with Dashiell for the construction of the replacement facilities on the Brown Street property. Construction, however, had already begun on July 15, 1964.

Construction was completed and the new facilities, which were solely intended to replace the Calvert Street property, were occupied in April 1965. Full payment of the cost of the new facilities was made on or before May 6, 1965.

### OPINION

In approaching our decision herein, it is important to keep in mind precisely what is involved. Concededly, the trust and the decedent are separate taxpayers. But the issue is not the right of one taxpayer on his own behalf to exercise a right of election conferred upon another taxpayer. The testamentary trustees are not seeking to exercise any right of election. The return in question is that of the decedent and his wife for the year of death and it is the decedent who is claiming *his* right of election on that return.

The focus of this case is a narrow one. Decedent's property was condemned and he received the proceeds thereof in the taxable year of, but prior to, his death. Also prior to his death, decedent had developed detailed plans for replacement and had embarked upon a course of implementation of those plans by acquiring new land and reaching an understanding with the contractors as regards the replacement building. In accordance with that understanding, prior to death, the land had been prepared for the erection of the building. The decedent's plans for replacement were fulfilled after his death by the residuary trustees under his will through the execution of the written contract to erect the new building and the completion of its erection.

The single question [2] before us is whether, under the foregoing circumstances, the decedent should be deprived of the right to postpone the recognition of gain from the condemnation realized in the year of death in accordance with the election provided for in section 1033 (a)

---

[2] Respondent concedes that the "similar or related in service or use to the property so converted" and the time of replacement requirements of sec. 1033(a)(3)(A) have been met.

(3) (A).[3] Petitioners argue that he should not be so deprived. Respondent argues that since the replacement was made, not by the decedent but by the residuary trust, which was concededly a separate entity for tax purposes, the right of election died with decedent. For the reasons hereinafter stated, we agree with petitioners.

To a large degree, our decision herein turns upon the effect to be given to *Estate of Isaac Goodman*, 17 T.C. 1017 (1951), revd. 199 F. 2d 895 (C.A. 3, 1952), which involved strikingly similar facts. In that case, the condemnation and the receipt of the proceeds thereof also occurred prior to the decedent's death and the reinvestment was made by the decedent's executors. We held that, under the language of the applicable statute (section 112(f) of the Internal Revenue Code of 1939 as it existed prior to amendment in 1951),[4] the replacement was

---

[3] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph :

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. For purposes of this paragraph—

(i) no property or stock acquired before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition ; and

(ii) the taxpayer shall be considered to have purchased property or stock only if, but for the provisions of subsection (c) of this section, the unadjusted basis of such property or stock would be its cost within the meaning of section 1012.

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(f) INVOLUNTARY CONVERSIONS.— If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of

required to be made by the same taxpayer whose property was condemned and that, since the decedent's estate was a separate taxable entity, that requirement was not satisfied. The Third Circuit Court of Appeals reversed on the grounds that our reading of the applicable statute and regulations was too narrow, that it was sufficient if the replacement was made either by the taxpayer "or one acting on his behalf" (see 199 F. 2d at 898), and that decedent's executors should be considered as having acted in this role.

Concededly, there are differences between the situation which existed in *Goodman* and that which exists herein. First, it can be argued that the replacement frame of reference of section 112(f) of the Internal Revenue Code of 1939 did not, as does section 1033(a)(3), which incorporated the provisions of the 1951 amendment to section 112(f),[5] specifically speak in terms of "the taxpayer." But we do not think that the semantic difference between the two provisions accords an "active" as contrasted with a "passive" aura (see 199 F. 2d at 896) to section 1033(a)(3) and requires us to adopt the narrow interpretation of that section which respondent urges upon us. There is nothing in the legislative history of the 1951 amendment or in the enactment of section 1033 of the Internal Revenue Code of 1954 which indicates that Congress intended a different reading of the statute because of the use of the phrase "the taxpayer" so as to produce a result contrary to that reached by the Court of Appeals in *Goodman*. See H. Rept. No. 798, 82d Cong., 1st Sess. (1951); S. Rept. No. 1052, 82d Cong., 1st Sess. (1951); H. Rept. No. 1337, 83d Cong., 2d Sess., p. A268 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 108, 427 (1954).

A second distinction rests upon the contention that *Goodman* involved a replacement by executors, whereas here the replacement was made by residuary trustees. We find it unnecessary to dwell upon this distinction and the nuances which may stem from the legal theory that executors may be considered "personal representatives" of a decedent, a categorization which does not easily apply to testamentary trustees. Compare *Briggs* v. *Walker*, 171 U.S. 466, 471 (1898); *Unsatisfied Claim and Judgment Fund* v. *Hamilton*, 256 Md. 56, 259 A. 2d 303 (1969); *Johnston* v. *Willis*, 147 Md. 237, 127 Atl. 862 (1925). Our focus in this case is upon the fact that the testamentary trustees were simply carrying to completion the very plans developed and partially implemented by the decedent prior to his death, a course of action which was

---

a replacement fund, no gain shall be recognized, but loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized to the extent of the money which is not so expended (regardless of whether such money is received in one or more taxable years and regardless of whether or not the money which is not so expended constitutes gain).

[5] Pub. L. No. 251, 82d Cong., 1st Sess. (1951), 65 Stat. 733.

contemplated by, and furnished the impetus for, the order of the Orphans' Court which directed that the land and building replacement funds be turned over by the executors to the trustees. In this context, we think that replacement by trustees should be treated no differently than replacement by executors. Moreover, we note that, in point of fact, it was the executors who set in motion the necessary legal proceedings to obtain permission to turn over the funds to the residuary trustees, thereby putting the latter in the position to make the replacement.

We do not have before us a situation where the owner of condemned property voluntarily chooses to have the replacement made by another. Compare *Fort Hamilton Manor, Inc.*, 51 T.C. 707, 718–719 (1969), on appeal (C.A. 2, Jan. 16, 1970) ; *Feinberg* v. *Commissioner*, 377 F. 2d 21, 27–28 (C.A. 8, 1967), affirming 45 T.C. 635, 639–640 (1966). Nor is the situation herein analogous to that where a partnership owns the condemned property and the proceeds are reinvested by some or all the partners and in differing fashions in accordance with their separate decisions, and where, in any event, special statutory provisions are involved. Compare *Mihran Demirjian*, 54 T.C. 1691 (1970), on appeal (C.A. 3, Nov. 6, 1970).

Here, the decedent was the architect of the plan of replacement and had, prior to his death, set in motion the actions to implement that plan. He was precluded from completing those actions by the untimely event of death. Thereafter, his successors in interest, proceeding in strict accordance with the decedent's plan, finished the job. Under these circumstances, although the issue is not free from doubt, we think that it can be said that, for the purpose of perfecting the right of election conferred upon the decedent by section 1033(a)(3), the testamentary trustees were acting on his behalf in making the replacement.

In view of the foregoing and taking into account that section 1033 is regarded as a relief provision to be liberally construed (see, e.g., *S. & B. Realty Co.*, 54 T.C. 863, 870 (1970)), we will no longer follow our decision in *Estate of Isaac Goodman, supra*, but rather will apply the rationale of the Third Circuit Court of Appeals.[6] As a further consequence, we also disagree with the respondent's pronouncement in Rev. Rul. 64–161, 1964–1 C.B. (Part 1) 298, to the extent that it rejects the reasoning of the Court of Appeals in *Goodman* and asserts that the command of section 1033(a)(3) inexorably prevents a realistic examination of the underlying facts in order to deter-

---

[6] In so stating, we do not include the rationale set forth in fn. 6 to the opinion of the Court of Appeals, as to which we refrain from expressing any opinion.

mine who is "the taxpayer." [7] Perhaps, as respondent suggests in Rev. Rul. 64–161, *supra*, there will be difficult questions in determining the proper basis for the replaced property in the hands of the testamentary trustees. But those questions are not before us. In any event, we do not think such purported difficulties can justify depriving the decedent herein of his right of election.

Reviewed by the Court.

*Decision will be entered for the petitioners.*

DAWSON, *J.*, concurring: In section 1033 Congress has expressed its view that an involuntary conversion (a fortuitous event) should not be a taxable event unless the taxpayer so elects. It seems contrary to the spirit of section 1033 that an involuntary conversion together with an untimely death (another fortuitous event) should provide an occasion for tax where, as here, the decedent's intention to replace is so clear. Neither the involuntary conversion nor the death, alone, would have provided the occasion for an income tax.

Thus I suspect that in the *Goodman* case the Court of Appeals for the Third Circuit was motivated more by a "fair reading" of the statute than the passive voice in which it was phrased. Its holding was: "A construction more logical and more consonant with the purpose of the statute is that it means the taxpayer or one acting on his behalf, before or after death. [199 F.2d at 898.]" I agree with the majority opinion that the change to the active voice suggests no change in substance.

The election under section 1033 is made on the taxpayer's return for the year of conversion. Sec. 1.1033(a)–2(c)(2), Income Tax Regs. Obviously a decedent cannot make the election (even if he has completed replacement before his death). Here, the decedent's executors, *acting on his behalf*, filed his final return and made the election. The proceeds were transferred to the testamentary trustees for actual replacement. The executors and the trustees were the same persons, the decedent's sons.

We would reach a highly technical result in this case if, considering

---

[7] We note that the Court of Appeals decision in Goodman was published as a court decision by respondent in 1954 (see 1954–1 C.B. 296) and that its rationale was followed in a 1958 published ruling (Rev. Rul. 58–407, 1958–2 C.B. 404). This was respondent's posture over a 10-year period until the issuance of Rev. Rule 64–161, 1964–1 C.B. (Part 1) 298 (which occurred 3 days after the death of the decedent herein). Concededly, this action does not in and of itself preclude respondent from correcting an erroneous position and, indeed, he may even do so retroactively. Cf. *Dixon* v. *United States*, 381 U.S. 68, 71–73 (1965). But "the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws" can be used as evidence of the proper construction of the law. See *Hanover Bank* v. *Commissioner*, 369 U.S. 672, 686 (1962).

the decedent's steps toward replacement and the election by his executors, we were to impose a tax because it was more convenient for the decedent's sons to complete replacement in their capacity as trustees rather than as executors. I view the trustees as merely carrying out the mandate of the executors and the Orphans' Court.

While there is a probability the capital gain may go untaxed, that is the result of section 1014 rather than section 1033. And, in any event, this is precisely what would have happened if the decedent had made the replacement before he died.

DRENNEN, FAY, HOYT, and SIMPSON, *JJ.*, agree with this concurring opinion.

---

KERN, *J.*, dissenting: Section 1033(a)(3)(A) provides that "if property * * * is * * * involuntarily converted * * * into money * * * *the gain* (if any) *shall be recognized except* * * * if *the taxpayer* * * * for the purpose of replacing the property so converted, purchases other property similar * * * to the property so converted * * *, at the *election of the taxpayer* the gain shall be recognized only to the extent that the amount realized upon such conversion * * * exceeds the cost of such other property." (Emphasis supplied.)

Section 1033(c) provides that "In the case of property *purchased by the taxpayer* in a transaction described in subsection (a)(3) which resulted in the nonrecognition of any part of the gain realized as a result of * * * involuntary conversion, the basis shall be the cost of such property decreased in the amount of the gain not so recognized." (Emphasis supplied.)

In the context of these sections of the Code and the definition of "taxpayer" in section 7701(a)(14) it is obvious that "the taxpayer" referred to in sections 1033(a)(3) and 1033(c) was the person subject to tax on the capital gain realized upon the involuntary conversion.

In the instant case "the taxpayer" died before the replacement called for by section 1033(a)(3)(A) was made. While the majority opinion points out that the taxpayer and other adult members of his family intended to make a replacement and some preliminary steps were taken in anticipation of the replacement which they intended, it is significant and cannot be questioned that none of them made the replacement and that none of them intended to or did enter into any binding agreement to make such replacement pending the expiration of a 30-day appeal period after the payment of the award. During that period the taxpayer and his wife invested the proceeds of the condemnation award and took no action committing themselves to the replacement. The taxpayer died 12 days after receiving the award and 18 days before he intended to commit himself to the replacement.

Although "the taxpayer" did not and could not perform the acts

required as a prerequisite to calling into play the exception provided by section 1033(a)(3)(A) to the general rule of recognition of gain set out in 1033(a)(3), the majority has concluded that he is nevertheless entitled to the benefits of that exception.[1] In reaching this result they state that they have been guided by the rationale of the Third Circuit Court of Appeals in *Goodman* v. *Commissioner*, 199 F. 2d 895, which reversed our own case of *Estate of Isaac Goodman*, 17 T.C. 1017, which was reviewed by the full Court without dissent.

Since the instant case is quite different in several crucial respects from the *Goodman* case and since the Court of Appeals in its reversing opinion confined itself to a consideration of those differences not present in the instant case, I am at loss to understand how the reasoning of that court can be taken as in any way sustaining the view of the majority.

One of those crucial differences is that in the *Goodman* case the replacement property was purchased by the decedent's estate and the replacement expenditures were made by the deceased taxpayer's executor acting specifically on behalf of the estate out of funds of the estate, while in the instant case the replacement expenditures were made by trustees of two residuary trusts set up in decedent's will in which the decedent's widow was the primary beneficiary and the trustees themselves (decedent's sons) or their issue were remaindermen. The trustees made these expenditures from the proceeds of a distribution which had been made to them by the executor; the replacement payments were made by the trustees out of their own funds acquired by such distribution from the estate; and title to the replacement property was taken in the names of the trustees and the widow. In this case no payment was made on the replacement property by the executor or anyone authorized to act on behalf of the decedent or his estate, no contract for replacement was executed by any such person on behalf of the decedent or his estate, and neither the executor nor any representative of the estate of the decedent ever acquired title to the replacement property.[2]

---

[1] In the majority opinion the question is stated as being "whether * * * the decedent should be deprived of the right to postpone the recognition of gain from the condemnation." It is submitted that a better statement would be "whether the decedent is entitled to the right or privilege to postpone the recognition of gain from the condemnation called for by section 1033(a)(3) by reason of the exception set out in section 1033(a)(3)(a)."

[2] In this connection, I point out the following facts which have been somewhat glossed over in the majority opinion:

(1) The decedent's will devised the residue of his estate to trustees of two trusts, one being referred to as the marital trust and the other being in effect a supplemental marital trust during his wife's lifetime. The wife as primary beneficiary was given considerable powers over distributions. Decedent's three sons were the trustees with broad powers "to invest as they may consider advisable or proper." The sons or their issue were to take whatever remained in the trusts on the death of their mother.

(2) The distributions of the Brown Street property and the General Motors Acceptance Corp. notes were made to the trustees by the executors "in order that said Residuary Trustees may proceed with the completion of said building plans."

(3) The title to the replacement property was held in the names of the widow and the trustees, and the lease of the property executed after the building was completed named the widow and the cotrustees as lessors.

In the *Goodman* case we held that the replacement of condemned property out of the proceeds of a condemnation award must be made by the taxpayer himself and that replacements made by any other person, even by the taxpayer's executor after his death, were not sufficient to call into play the nonrecognition provisions of the 1939 Code.

Our decision in that case was reversed by the Court of Appeals. The opinion of that court states three grounds for reversal. The first ground was that the applicable statute (section 112(f)) quoted in the majority opinion does not specifically require that "the taxpayer" take any action since that section "is stated in the passive sense" thus indicating that Congress was not "concerned about the identity of the actor, *so long as he acted on behalf of the* taxpayer." (Emphasis supplied.) Second, the numerous references in the pertinent regulations to actions required by "the taxpayer" (thus following the phraseology of the original 1921 Act) were not deemed significant, since the Court of Appeals considered "taxpayer" to mean "the taxpayer or *one acting on his behalf, before or after his death.*" (Emphasis supplied.) Third, since the decedent's estate "acting through the executor made the reinvestment" and since the executor is required to file a return for his decedent's final period, the court could "see no reason why the executor may not do what the taxpayer could have done to perfect a right which came into being in the final taxable period." By a footnote the Court of Appeals suggests that the executor as a representative of the decedent taxpayer's estate may be considered as the taxpayer.

None of these grounds of reversal are relevant to the facts of the instant case and consequently the opinion of the Court of Appeals is irrelevant to the problem before us. Section 112(f) of the 1939 Code which governed the disposition of the *Goodman* case was succeeded in 1951 by what now appears as section 1033 of the 1954 Code which applies to this case. Section 1033(a)(3), applying to "the disposition of * * * converted property" occurring after December 31, 1950, is stated in the active sense and requires certain actions to be taken by "the taxpayer." The majority opinion dismisses this circumstance as a mere "semantic difference between the two provisions" having no relevance to an interpretation of the statute or, as the majority opinion would have it, the two provisions do not accord "an 'active' as contrasted with a 'passive' aura * * * to section 1033(a)(3) and [do not require] us to adopt the narrow interpretation of that section which respondent urges upon us." In view of the fact that the majority relies on the opinion of the Court of Appeals in the *Goodman* case and the fact that that opinion considered as both relevant and

persuasive the use of the "passive sense" in section 112(f) as indicating the lack of concern on the part of Congress "about the identity of the actor," it would seem only fair to consider a subsequent change in the applicable statute from a "passive sense" to an "active sense" as some indication that Congress had some concern "about the identity of the actor." At the very least, this change eliminates any "semantic" reason for disregarding the plain literal meaning of the requirements imposed by section 1033(a)(3)(A) as a prerequisite to the availability of the exception to the general rule of the recognition of realized taxable gains which is stated therein. The second and third grounds for reversal obviously have no valid application to the facts of a case such as the one before us where the requisite reinvestment is made, not by the decedent's executor and personal representative [3] who is acting in all respects on behalf and as representative of his estate, but by testamentary trustees who, by the use of distributions made to them by the executors, have acquired title to the replacement property for the benefit of legatees named in decedent's will.

On the crucial question of whether the testamentary trustees may be considered as a matter of law to be acting on behalf of the deceased taxpayer and their actions equated with the actions of the "taxpayer" called for by section 1033(a)(3)(A) as a prerequisite to the exception granted therein, the majority opinion in effect concedes that testamentary trustees cannot be considered "personal representatives" of a decedent such as executors and are separate legal entities not to be confused with the decedent, his estate or his personal representative.[4] Nevertheless the majority contends that "replacement by trustees should be treated no differently than replacement by executors" since they were carrying out by their actions the intent of the decedent formed prior to his death. The opinion continues with the statement that the trustees as "successors in interest" proceeded in "accordance with the decedent's plan," and "finished the job." The conclusion of the majority, "although not free from doubt," is that "the testamentary trustees were acting on [decedent's] behalf in making the replacement."

The actions taken by the trustees which accomplished the replacement of the condemned property were taken pursuant to their own

---

[3] See *Briggs* v. *Walker*, 171 U.S. 466, 471, in which the Supreme Court points out that the words "representative," "legal representative," or "personal representative" mean "executors or administrators." To the same effect, see *Thompson* v. *United States*, 20 Ct. Cl. 276, 278 ; *Unsatisfied Claim and Judgment Fund* v. *Hamilton*, 256 Md. 56, 259 A. 2d 303, 306. For a Maryland case pointing out a distinction between an executor and a testamentary trustee, see *Johnson* v. *Willis*, 147 Md. 237, 127 Atl. 862, 864.

[4] This is true even though, as in this case, the same persons are nominated by the decedent's will to serve as executors and as testamentary trustees. *In Re Oliff's Estate*, 283 Mich. 43, 276 N.W. 893, 894 (1937).

intent and the intent of their mother, the beneficiary of the trusts and coowner of the condemned property. That property was business property used by Shore Distributors, Inc., a corporation engaged in the wholesale distribution of plumbing and heating supplies. It is stipulated that all of its stock was held by the decedent, his wife, and the three sons who were the testamentary trustees. It was this corporation which received bids for the construction of the replacement property, and it was this corporation which leased the replacement property from decedent's widow and the three adult sons of petitioner who were the trustees. As such trustees they held all of decedent's stock in the corporation during their mother's lifetime with remainder in themselves or their issue at her death, they owned individually their own stock in the corporation, and their mother, the beneficiary of the trusts, owned her stock.[5] It would seem obvious that the actions of the trustees and decedent's widow in making the replacement of the condemned business property were taken, not as merely the pious fulfillment of the wishes of a deceased parent and spouse, but for business reasons connected with their own pecuniary interests as the real owners of the family business corporation which was to be the lessee of the replacement property as it had been of the condemned property.

I am unable to understand the characterization of the trustees by the majority opinion as "successors in interest" and the clear implication that since they are "successors in interest" to decedent they should be considered as acting on decedent's behalf as if they were executors, i.e., as if they held a legal status which they obviously did not. No authority is cited. With all deference, it is submitted that on the facts here present the trustees are not and cannot be considered as "successors in interest" to decedent. See *City of New York* v. *Turnpike Development Corp.*, 36 Misc. 2d 704, 233 N.Y.S. 2d 887, 890 (1962).

Since there is no capacity in law or in equity in which the trustees could act for the decedent in making the replacement and since as a practical matter the trustees were acting in this matter on behalf of themselves (as holders of the legal title and equitable remainder interests) and on behalf of the beneficiary of the trusts, I consider as completely untenable the conclusion of the majority that "the testamentary trustees were acting on his behalf in making the replacement."

Another reed upon which the majority opinion leans is a footnote which attempts to show an administrative construction inconsistent with the respondent's position in this case, as evidenced by his publica-

---

[5] I am unable to find any reference in the majority opinion to these stipulated facts having to do with Shore Distributors, Inc.

tion of the Court of Appeals' opinion in the *Goodman* case and his application of this opinion to facts having no resemblance to the facts of the instant case in 1954–1 C.B. 296. The short answer is that respondent has never taken an administrative position on facts similar in principle to those before us which is inconsistent with his position in this case.

The majority opinion makes a point that section 1033 should be regarded as a relief provision. However it is clear that the relief intended by Congress is not to eliminate from the incidence of Federal taxation all capital gain realized by a taxpayer upon condemnation but to merely "postpone recognition of involuntry capital gain" under the exceptionl circumstances set out in section 1033(a)(3)(A). *Cotton States Fertilizer Co.*, 28 T.C. 1169, 1173. In view of the fact that the replacement purchase was made in this case by the testamentary trustees from a distribution of assets made to them by the decedent's estate it may well be that the basis of the acquired property in the hands of the trustees will be governed by section 1014 and not by section 1033(c). Thus the shocking result of the majority opinion would be to eliminate from any taxation at any time the capital gain realized by decedent prior to his death.

WITHEY, *J.*, agrees with this dissent except for last sentence.

FORRESTER and SCOTT, *JJ.*, agree with this dissent.