O. J. Smith and Minnie R. Smith, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 555-70. Filed August 31, 1971.

*Jeff D. Batts,* for the petitioners.
*Steve C. Horowitz,* for the respondent.

Irwin, *Judge:* Respondent determined a deficiency in petitioners' income tax for 1968 in the amount of $8,986.88. The deficiency arises from petitioners' treatment of the gain realized on the sale of a 1-acre lot from a particular tract of their land. Another portion of this same tract had previously been taken for public use in a condemnation proceeding. The sole issue for determination is whether the sale falls within the ambit of section 1033(a)(3)(A) of the Internal Revenue Code of 1954 [1] so that a part of petitioners' gain on the sale will not be recognized.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are incorporated herein, along with the exhibits attached thereto, by this reference.

Petitioners are husband and wife, residing at Route 1, Whitakers, N.C., and their joint income tax return for 1968 was filed with the director, Southeast Service Center, Chamblee, Ga.

Petitioners are engaged in the business of farming and during the year 1965 owned approximately 1,200 acres of land in Nash County, N.C. The Agricultural Stabilization and Conservation Service of the U.S. Department of Agriculture (hereafter referred to as ASCS) classified 673.9 of petitioners' 1,200 acres as cropland.

Although petitioners' acreage consisted of several, legally distinct tracts, ASCS, in determining the crop allotments and bases applicable to petitioners, treated the entire 1,200 acres as a single farm. The crop allotments and bases applicable to petitioners' farm in 1965 were as follows:

---

[1] All statutory references, unless otherwise specified, are to the Internal Revenue Code of 1954, as amended.

| Crop | Acres | Crop | Acres |
|------|-------|------|-------|
| Cotton | 123.00 | Wheat | 13.00 |
| Tobacco | 60.01 | Corn | 258.00 |
| Peanuts | 86.30 | | |
| | | Total | 540.31 |

Included in petitioners' 1,200 acres was a 143.4-acre tract known as the third tract of the Pitt estate (hereafter referred to as Pitt No. 3) which was acquired by petitioners on January 19, 1951, at a cost of $20,100. Pitt No. 3 is located at the southeast intersection of North Carolina Highway No. 48 and North Carolina Highway No. 44, at Hickory, North Whitakers Township, Nash County. Pitt No. 3 contained 25.2 acres of cropland and was not contiguous with the rest of petitioners' acreage.

During the years 1962, 1963, and 1964, Pitt No. 3 was farmed by wage and day laborers hired by the male petitioner or his son-in-law, Gene Watson. Beginning on January 1, 1965, and continuing until the present time. Pitt No. 3 has been farmed by Austin Cooper, a tenant farmer, on a 50–50 basis with petitioner.

Where one or several of the tracts of land comprising a farm are not adjacent to the parent farm, the cropland-percentage method is used to prorate the crop allotments applicable to the parent farm among the various component tracts. The crop allotment will be allocated in the same proportion that the cropland acreage for each component tract bears to the entire cropland acreage of the farm. Thus, in 1965, 20.66 acres of cropland allotments were allocated to the 25.2 acres of cropland in Pitt No. 3.

On February 16, 1965, the North Carolina State Highway Commission (hereafter referred to as Highway Commission) filed in the Superior Court of Nash County, a complaint and declaration of taking to acquire 19.91 acres of Pitt No. 3 for public use in the construction of a right-of-way and temporary asphalt easement for Interstate Highway No. 95. The acreage to be taken was to be utilized as follows:

| | For right-of-way (acres) | For temporary easement (acres) |
|------|-------------------------|-------------------------------|
| Cropland | 4.22 | 1.18 |
| Woodland | 13.56 | .95 |
| Total | 17.78 | 2.13 |

On March 8, 1967, petitioners and the Highway Commission entered into a consent judgment terminating the condemnation proceeding. No monetary consideration or compensation was awarded for the property taken, the parties agreeing that as a result of the taking, the remaining acreage in Pitt No. 3 would be enriched in value and that this accrued benefit to petitioners' land outweighed any damage caused by the taking.

The 2.13 acres comprising the asphalt temporary easement was returned to petitioners following completion of the highway project. The Highway Commission agreed to plow up the asphalt road and restore the 2.13 acres to tillable condition but, upon petitioners' request, the asphalt road was left intact.

No crop allotments were lost by petitioners as a result of the taking. The consequence of the reduction in cropland in Pitt No. 3 was that now a lesser allotment of crops would be allocated to Pitt No. 3. More specifically, the cropland-percentage method would now provide 17.1 acres of crop allotments to the remaining 19.8 acres of Pitt No. 3 cropland.

The taking from Pitt No. 3 of 19.91 acres did not curtail farming operations on that tract. Pitt No. 3 was an integral part of petitioners' farming operation before the taking, and it has continued as such subsequent to its diminution in size.

On their joint income tax return for 1967, petitioners reported a section 1231 loss in the amount of $4,705.22 with respect to the acreage taken by the Highway Commission.

On January 31, 1967, after notice of the taking but before a consent judgment was reached, petitioners purchased an 83-acre tract adjacent to Pitt No. 3 (the C. K. Devereaux tract, hereafter referred to as the Devereaux tract) at a cost of $36,000. On November 21, 1968, petitioners made a gift of the Devereaux tract to their daughter and son-in-law Sarah and Gene Watson.

At the beginning of 1967, petitioners' son-in-law, Gene Watson, began negotiations with representatives of Humble Oil Co. in Raleigh, N.C. (hereafter referred to as Humble), regarding Humble's purchase of a 1-acre lot from Pitt No. 3 adjoining the right-of-way to Interstate No. 95. Humble wanted to construct a gasoline station at this right-of-way. On July 3, 1967, a land purchase option was executed between Humble and petitioners whereby Humble agreed to purchase 1 acre of Pitt No. 3 for $50,000. On February 29, 1968, in accordance with the option agreement, the sale was consummated, petitioners realizing a gain of $48,923.16.

On petitioners' joint income tax return for 1968, petitioners reduced the $48,923.16 gain on the sale to Humble by $36,000, asserting that under section 1033 (a) (3) (A), the sale was an involuntary conversion, the proceeds from which were used to reinvest in similar or related-use property, i.e., the Devereaux tract.

Respondent disallowed petitioners' treatment of the sale transaction.

OPINION

The question presented is whether section 1033 (a) (3) (A) is applicable to the facts here before us. Those facts may be summarized as follows: Petitioners, in the farming business, owned a 143.4-acre

tract of farmland known as Pitt No. 3 which was not contiguous with the rest of their farmland, yet was still an integral part of their 1,200-acre farming operation. On February 16, 1965, the North Carolina State Highway Commission filed a declaration to take 19.91 acres of this 143.4-acre tract. Interstate Highway No. 95 was going to be constructed through part of Pitt No. 3 and the 19.91 acres were to be used to furnish a right-of-way to the new highway and a temporary asphalt easement for a detour road to the new highway. Early in 1967, before petitioners and the Highway Commission reached a consent judgment in the condemnation proceedings, petitioners purchased an 83-acre tract of land adjacent to Pitt No. 3. This tract, the Devereaux tract, was the alleged replacement property. After filing of the consent judgment, on July 3, 1967, petitioners entered into an option agreement with Humble Oil Co. for the purchase of 1 acre of Pitt No. 3. On February 29, 1968, the sale to Humble was finalized. As a result of the taking, the cropland in Pitt No. 3 was reduced by 5.4 acres. Petitioners then had available for their 540.31 acres of crop allotments 668.5 acres of tillable cropland. Although the taking reduced the amount of cropland available to petitioners for farming, no crop allotments were lost as a result of the taking of 19.91 acres in Pitt No. 3.

Petitioners viewed the Pitt No. 3 operation as a single farming unit unto itself, possessing its own amount of cropland and concomitant crop allotments. Moreover, petitioners viewed the condemnation as removing so much cropland from this farming unit that Pitt No. 3 could no longer accommodate the crop allotments allocated to it and, therefore, the tract was no longer feasible for farming. Further, the sale of the 1-acre lot from the remaining portion of Pitt No. 3 was considered by petitioners to be a realization of part of their just compensation for the taking. No monetary compensation had been awarded since petitioners' remaining acreage in Pitt No. 3 was supposedly enhanced in value by the taking.

Section 1033 (a) (3) (A) [2] provides taxpayers with nonrecognition of gain treatment when property has been involuntarily converted,

---

[2] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its * * * condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) Nonrecognition of gain.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. * * *

at a gain, into money or dissimilar service or use property, and the proceeds therefrom are reinvested in property similar in service or use to the converted property.

Petitioners have placed reliance on the interpretation of section 1033(a)(3)(A) found in *Harry G. Masser*, 30 T.C. 741 (1958), a case decided under section 112(f)(1) of the 1939 Code, the predecessor of present section 1033(a)(3)(A). There petitioner was allowed non-recognition relief when only part of his economic unit was involuntarily converted and his remaining operation was rendered impractical by the taking. Petitioner had owned a freight terminal and eight vacant lots directly across the street which were used for storing his semitrailers when not in use. Because of the shortage of loading docks at the terminal, petitioner had to move his semitrailers frequently between the parking lots and the freight terminal in order to transfer the contents to delivery trucks. The availability of parking space nearby to the freight terminal, therefore, was a substantial determinant of petitioner's profit. The parking lots were condemned and, being unable to secure satisfactory replacement lots, petitioner sold the freight terminal. The proceeds from the sale of the terminal plus the proceeds from the condemnation of the parking lots were used by petitioner to purchase similar terminal and parking facilities to accommodate petitioner's business operation.

We held in *Masser* that:

when two pieces of property, practically adjacent to each other, were acquired for the purpose of being used and were used in taxpayer's business as an *economic unit*, when one of the pieces of property was involuntarily sold as a result of the threat of condemnation, when it was apparent that the continuation of the business on the remaining piece of property was *impractical,* and as a result of the involuntary sale of the one piece of property the taxpayer in the exercise of good business judgment sold the other piece of property, and when the proceeds of both sales were expended in the acquisition of property similar to the economic unit consisting of the two properties sold, the transaction, considered as a whole, constitutes an involuntary conversion of one economic property unit within the meaning of section 112(f). [Emphasis supplied. 30 T.C. at 747.]

Following our decision in *Masser*, the Internal Revenue Service decided in Rev. Rul. 59–361, 1959–2 C.B. 183, that:

where all facts and circumstances show a substantial economic relationship between the condemned property and the other property sold by the taxpayer, so that together they constituted one economic property unit, such as existed in the *Masser* case, involuntary conversion treatment for the proceeds of the voluntary sale will be permitted. The taxpayer must show the unavailability of suitable nearby property of a like kind to that converted and the proceeds of the voluntary sale must be expended in acquiring property of a like kind.

In the case here before us, petitioners have failed, on the record, to fit within the facts of *Masser* and they do not satisfy the above-quoted guidelines set forth in Rev. Rul. 59–361.

First, the 19.91 acres of Pitt No. 3 involuntarily converted and the 1 acre of the same tract sold to Humble did not, by themselves, represent one economic property unit. Furthermore, Pitt No. 3 in its entirety did not represent one economic property unit. Petitioners were engaged in the business of farming and their total 1,200 acres represented the one economic property unit to be evaluated here. Petitioners' farming operation was integrated among several tracts of land, even though one of them in particular, Pitt No. 3, was not contiguous with the rest of the farm.

Second, petitioners have failed to show the unavailability of suitable like-kind property near to the converted acreage. The remaining acreage in Pitt No. 3 after the taking and, indeed, the entire farm remaining after the taking was available and suitable to petitioners' farming operation and certainly related in kind to the converted property. We must emphasize that petitioners operated an integrated farm. The consequences of the taking were that petitioners lost a mere 5.4 acres of tillable cropland in Pitt No. 3 and that petitioners' crop allotments would now have to be adjusted to reflect this change. Petitioners still had their 540.31 acres of crop allotments to prorate among the tracts of land which constituted their one economic unit. After the taking, petitioners had sufficient cropland available to absorb their allotments and to feasibly continue their business of farming.

In view of the foregoing, we hold that petitioners' treatment of the gain from the sale of land to Humble Oil Co. was incorrect. Petitioners' $48,923.16 gain cannot be diminished by the cost of the alleged replacement property. Petitioners have failed to prove that the condemned property and the property sold to Humble were an economic unit unto themselves, and have failed to show that the taking rendered the continuation of their business on their remaining land impractical. The relief we afforded in *Masser* is a logical incorporation of the purpose of section 1033(a)(3)(A), that is, to allow a taxpayer to replace his property without recognition of gain when he must give up that property through circumstances beyond his control. However, to find for petitioners here would be tantamount to finding an involuntary conversion where a voluntary sale existed. Petitioners voluntarily sold their 1-acre lot in a transaction separate and apart from the condemnation proceedings. This does not represent an involuntary conversion.

*Decision will be entered for the respondent.*