FOREST CITY CHEVROLET, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Forest City Chevrolet v. Commissioner
Docket No. 6305-73.
United States Tax Court
T.C. Memo 1977-187; 1977 Tax Ct. Memo LEXIS 254; 36 T.C.M. (CCH) 768; T.C.M. (RIA) 770187; June 15, 1977, Filed *254 Held, petitioner sold only a portion of its property under "threat or imminence" of condemnation, pursuant to sec. 1033, I.R.C. 1954. Other portions of its property were not sold under "threat or imminence" of condemnation. Burton L. Williams, for the petitioner. Justin S. Holden, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioner's income taxes: Year
Deficiency
1964
$ 219.24
1967
30,274.12
1968
15,020.28
1969
561.24
1970
45,655.13
The sole issue is whether petitioner sold certain property under "threat or imminence" of condemnation, pursuant to section 1033. [1] *255 FINDINGS OF FACT Some facts were stipulated and are found accordingly. Petitioner was in the business of selling and servicing automobiles in Portland, Maine. It maintained its main offices and principal place of business at 83 Winslow Street, Portland, Maine, [2] from 1911 until July of 1970. After July of 1970, including the date the petition herein was filed, petitioner's main offices and principal place of business were located at 1000 Brighton Avenue, Portland, Maine. Petitioner regularly kept its records and filed its income tax returns using the accrual method of accounting. It filed its returns with the District Director of Internal Revenue, Augusta, Maine, for the years in issue. In 1955, petitioner transferred a parcel of real estate to the Deering Village Corporation (hereinafter Deering). In 1962, petitioner reacquired this parcel from Deering for $65,000. After reacquiring the parcel, petitioner built *256 a new truck center on the site for approximately $100,000. In 1963, petitioner leased a 6,300 square foot lot from Deering. This lot was located on the corner of Bedford Street and Forest Avenue, adjacent to petitioner's property. During 1964, petitioner erected two carports, a second sales building, and a sign on the lot, for use as a used car lot. The sign, lights, and paving for the lot cost approximately $55,000. The design for the carports and advertising sign were conceived in Detroit, Michigan, and purchased through the Chevrolet Motor Division. The carports had to be approved by the Chevrolet Motor Division in Detroit before they could be built. The used car lot permitted the display of approximately 48 used cars for sale. Also in 1964, petitioner acquired a parcel of real estate from Beatrice Noyes and the estate of her husband for $32,000 (sometimes hereinafter the Noyes lot). Petitioner devoted the lot to storage of new cars and trucks and employee parking. In December of 1964, petitioner's president, Philip Gemmer (hereinafter Gemmer), received a report from petitioner's law firm indicating that a new interstate highway was going to be developed and that land *257 was needed for this interstate in the vicinity of petitioner's property. On September 8, 1965, the city of Portland approved the location of I-295, the new interstate. On October 20, 1965, the Maine State Highway Commission approved the location, and an agreement was signed between the city and the state. Early in 1966, Gemmer and his attorney, John A. Mitchell (hereinafter Mitchell), met with Bruce Dalton (hereinafter Dalton), Planning Director for the city of Portland. The city of Portland had the responsibility for making plans for the change of traffic flow and arrangements for the approaches to the proposed interstate system. Dalton showed Gemmer and Mitchell maps that detailed curblines on Forest Avenue and Bedford Street. The curblines for the new interstate ran through the middle of petitioner's carports. There was also an elimination of access ways to these carports. Finally, a triangular tip of land at the corner of Winslow and Bedford Streets was shown as being taken for the interstate. Between December of 1966 and January of 1967, Gemmer and Mitchell went to see Clarence Hart (hereinafter Hart), the right-of-way engineer for the Maine State Highway Department. *258 Hart referred Gemmer and Mitchell to George Kirk, an assistant who was in charge of the area covered by petitioner's site. A Maine State Highway Commission map showed that curblines went through the carports; this area was to be a controlled access area. George Garrett (hereinafter Garrett) became the executive vice president of the Greater Portland Chamber of Commerce in 1960. The Chamber of Commerce encouraged the University of Maine to establish a campus in Portland. As the university began to develop its campus, the university encountered a severe parking problem since most of its students were commuters who came to the university by automobile. Many students were parking their cars on Bedford Street near petitioner's facilities; the university was located nearby. The city of Portland began issuing parking violations to the students. To ease the parking problem, Garrett met with Francis McGuire (hereinafter McGuire) of the University of Maine to see if some off-street parking lots could be acquired for the students. Garrett suggested to McGuire that the university acquire petitioner's storage lot and employee parking facility (the Noyes lot). McGuire indicated an *259 interest in petitioner's property. Shortly thereafter, Garrett called Gemmer to tell him of his conversation with McGuire regarding the acquisition of petitioner's property. Garrett told Gemmer that it appeared that the Highway Department was going to take part of petitioner's property fronting on Forest Avenue and that the University of Maine might be interested in acquiring the remainder of petitioner's property in the area. Subsequently, on or about August 19, 1965, McGuire met with Gemmer at Gemmer's request. At that meeting McGuire told Gemmer that the university would be interested in acquiring petitioner's storage lot anytime it might be available. He also told Gemmer that the university would be reluctant to acquire land by eminent domain and that the future of the Portland campus was unclear due to current political and economic forces. McGuire again met with Gemmer in April of 1966, when petitioner's attorney, John A. Mitchell, was present. McGuire discussed eminent domain with Mitchell and Gemmer at the April 1966 meeting and indicated that the university was reluctant to use eminent domain because of its image in the community. McGuire reiterated that the future *260 of the Portland campus was unclear. Shortly after the meeting, Mitchell proposed a swap of land between the university and petitioner. He proposed that the university take the parking and storage area on Bedford Street and transfer equivalent land to petitioner on Winslow Street. McGuire rejected this proposal indicating that the university was acquiring land that it needed and could not afford to swap any of the land it had already acquired. Mitchell also contacted the State Highway Commission to see if they would allow petitioner to store and park cars on any of the land being acquired for the interstate highway. The State Highway Commission rejected this proposal. At some time in their discussions, McGuire told Gemmer that the university would only use eminent domain under the most urgent circumstances and only if the property were to be used for a building site, not for surface parking. Gemmer was aware that the university wanted the Noyes lot for surface parking. In December of 1966, Gemmer received a copy of a report by the Portland City Council regarding expansion of the University of Maine in Portland. This report showed petitioner's entire property as part of a first *261 stage expansion of the university. Throughout 1966 and into 1967, Gemmer received visits from neighbors whose property was being acquired by the University of Maine. On April 25, 1967, the property of Myron Finkelman (hereinafter Finkelman), whose property was located directly across the street from petitioner's storage lot (the Noyes lot), was taken by eminent domain. During McGuire's 28-year tenure at the university, this was the only instance in which eminent domain was used. In this case, the university relied on Finkelman's promise to sell his property to the university. It purchased a number of lots around the Finkelman property, razed the buildings, and commenced grading when Finkelman refused to sell. After lengthy negotiations with Finkelman, McGuire recommended the use of eminent domain. The university did not itself have statutory eminent domain authority. The university trustees had to authorize McGuire to request such authority from the governor. Pertinent excerpts from correspondence between Gemmer and McGuire are as follows: February 1, 1968 Our 46th Year Mr. Francis S. McGuire, Director of Physical Plant, University of Maine, 113 Service Building, Orono, *262 Maine 04473 Dear Mr. McGuire: * * *
At the time of our last meeting, you had requested that when I write to you regarding our appraisal, I also mention our time table. Once again I have to return this to you, sir, in that our time table is pretty much based on what, and to what degree, UMP intends to do, and when. If monies were not an important issue to the UMP expansion program, we could hasten our target (dates) and aim for as early a transfer of properties to UMP as possible. For instance, if we knew that the University was willing to purchase all of our properties, say within the next year and a half, we would then use this as our target date to relocate by then. If, however, only certain parcels are of immediate interest, we have an instant crippling effect on the total operation, plus a marked decrease in the market value of the remaining properties. The effect of this would also leave us no alternative but to relocate because of the necessary (functions) the "Deering Noyes parcel" represents. (At this point, not only is decreased market value important, but also time becomes a major consideration.) If, however, the University decided to take none of our properties, *263 we very definitely would strongly consider remaining where we are. Thus, I cannot answer your "time table" question adequately. As the above is of the utmost interest to both of us, I am looking forward to further meetings with you in the very near future. Thank you for your always fine cooperation. Sincerely, Philip Gemmer President Department of Physical Plant February 23, 1968 Mr. Philip Gemmer, President, Forest City Motor Company, 83 Winslow Street, Portland, Maine
Dear Mr. Gemmer: I am sorry it has taken so long to acknowledge receipt of your 1 February letter.
We do appreciate the appraisal report you sent and also your remarks concerning the options open to us. The observations that follow do not reflect decisions of either President Young or our Board of Trustees, hence, they are subject to change. The outlook for capital funds of an extent that would enable us to acquire your entire property at, say, a half million dollars seems remote indeed. As you know, the composition of the University of Maine is about to change and we will be venturing into unknown areas with a presently unknown board of trustees and an equally unknown chancellor. However, *264 we do know that there will be stronger higher educational fund demands that may well preclude rapid expansion in areas such as we are discussing. It is also reasonable to assume that we will attempt to acquire separately your property north of Bedfore [sic] Street within two or three years, and sooner if you move your operation for other reasons. As we see them today, our building needs for the next four years do not include a structure or structures such as yours and so, even if there were no serious money problem, it would be difficult to justify such an expenditure for a non-specific use. I am sorry we cannot be more encourageing [sic] but the foregoing is about as we see it. We are grateful for your frankness and willingeness [sic] to be of assistance to us. Sincerely, F. S. McGuire Director Beginning in October of 1967, options on various parcels of property on Brighton Avenue were acquired for petitioner's benefit. On February 22, 1968, the City Planning Board of Portland, Maine, issued a report recommending approval of a variance for petitioner to erect an automobile dealership facility on Brighton Avenue. On April 1, 1968, Gemmer personally took title to *265 the property. On or about May 22, 1968, Gemmer and his wife offered an option to acquire the property to petitioner. Shortly thereafter, Gemmer received a summary of a meeting between representatives of the city of Portland and the university in Portland. This meeting included Francis McGuire and Barnett Shur, counsel for the university. The summary stated that "[there] have been no verbal threats of eminent domain, although owners are conscious of it." University officials indicated their interest in acquiring additional property in the fall of 1968 in the area of petitioner's site.At no time in his dealing with petitioner's representatives did Barnett Shur threaten eminent domain. During October of 1968, petitioner entered into a purchase and sales agreement for the disposition of its main building with Farrar-Brown, Inc. This property was ultimately sold to Farrar-Brown, Inc., on July 31, 1970. On February 18, 1969, petitioner exercised the option to acquire the Brighton Avenue property from Gemmer and his wife. On March 28, 1970, petitioner sold the lot used to store new cars and trucks (the Noyes lot) to the University of Maine. On July 2, 1971, the remaining property *266 of the Winslow Street facility was sold by petitioner to Maine Radio and TV, Inc. The proceeds from the sale of the various parcels were reinvested in the new dealership that was constructed on the Brighton Avenue property. The new facility was completed and occupied in 1970. OPINION Section 1033(a) states in part that: If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsory or involuntarily converted [Emphasis added] gain need not be recognized if certain conditions (not important herein) are met. The sole issue for decision centers around the words emphasized above, "threat or imminence." Petitioner contends that certain of its property was sold under threat or imminence of condemnation; respondent contends that it was not. If the property was sold under threat or imminence of condemnation, petitioner may invoke section 1033 and defer gain. If it was not, petitioner may not defer gain. Petitioner argues that the "threat or imminence" of condemnation was caused by *267 the land needs of two projects: an interstate highway cutting through Portland, Maine, specifically I-295, and the developing Portland campus of the University of Maine. We will treat each of these alleged threats in turn. In 1964, petitioner's president, Philip Gemmer, received a report from petitioner's law firm indicating that a new interstate highway was being developed and that land was needed for the interstate in the vicinity of petitioner's property. Early in 1966, Gemmer and John A. Mitchell, his attorney, saw maps in the possession of agents of the city of Portland which showed that a triangular tip of land at the corner of Winslow and Bedford Streets was being taken for the interstate. During 1966 and 1967, Gemmer and his attorney saw maps in the possession of agents of the city of Portland and the Maine State Highway Commission which showed that curblines for the interstate went through petitioner's carports where used cars were displayed. These maps also showed that certain access ways to the carports would be eliminated. Petitioner also alleges that parking was to be eliminated on Bedford Street, that Winslow Street was to be closed, and that a small strip of land, *268 on Bedford, in front of petitioner's main building, was to be taken. These various pieces of property constitute only a portion of petitioner's land in the Forest-Bedford-Winslow area. The next step in petitioner's argument is to focus specifically on the carports where used cars were displayed. Petitioner alleges that the sale of used cars is one of the most important functions of a dealership because the number of new cars that can be sold is determined by how effectively and profitably used cars, taken as trade-ins, can be sold. Petitioner further alleges that the used car department of a new car dealership can account for 40 to 50 percent of a dealer's profits. Having made these allegations, petitioner turns to the third step of the argument. It alleges that the loss of the carports and the other losses described above bring it within the shelter of Masser v. Commissioner,30 T.C. 741 (1958). In Masser the taxpayer was forced to sell one piece of property under threat of condemnation. Since the continued operation of his business on the remaining piece of property was impractical, he decided to sell the remaining piece and invested the proceeds of *269 both sales in similar property in the general area. We held that the property represented an economic unit and that the sale of both pieces of property constituted an involuntary conversion. In short, petitioner wants us to hold that the carports and land taken were essential to petitioner's operation; accordingly, petitioner should be afforded relief under section 1033 for all its property in the area around Forest Avenue and Bedford and Winslow Streets. Even if we read Masser as broadly as petitioner wants, [3] its argument must still fail. In Masser the two pieces of property were an economic unit; the continuation of business on the remaining piece of property was impractical. It is clear that the continuation of business on petitioner's remaining property was not impractical; accordingly Masser is inapplicable. We conclude that continuing petitioner's dealership on the remaining property was not impractical because of a letter from Gemmer to Francis McGuire, set out below. McGuire represented the University of Maine in its negotiations with petitioner. Gemmer wrote this letter in early 1968, long after he knew about the interstate and the effect it would *270 have upon petitioner. It is clear from this letter, particularly the emphasized portions, that petitioner was concerned about the effect that the University of Maine would have upon its business and not the effect of the interstate. Petitioner may not have liked the encroachment of the highway, but this did not cause it to sell its remaining land in the Forest-Bedford-Winslow area. February 1, 1968, Our 46th Year Mr. Francis S. McGuire, Director of Physical Plant, University of Maine, 113 Service Building, Orono, Maine 04473 Dear Mr. McGuire
* * *
At the time of our last meeting, you had requested that when I write to your regarding our appraisal, I also mention our time table. Once again I have to return this to you, sir, *271 in that our time table is pretty much based on what, and to what degree, UMP intends to do, and when. If monies were not an important issue to the UMP expansion program, we could hasten our target (dates) and aim for as early a transfer of properties to UMP as possible. For instance, if we knew that the University was willing to purchase all of our properties, say within the next year and a half, we would then use this as our target date to relocate by then. If, however, only certain parcels are of immediate interest, we have an instant crippling effect on the total operation, plus a marked decrease in the market value of the remaining properties. The effect of this would also leave us no alternative but to relocate because of the necessary (functions) the "Deering Noyes parcel" represents. (At this point, not only is decreased market value important, but also time becomes a major consideration). If, however, the University decided to take none of our properties, we very definitely would strongly consider remaining where we are. Thus, I cannot answer your "time table" question adequately. As the above is of the utmost interest to both of us, I am looking forward to *272 further meetings with you in the very near future. [Emphasis added.] * * *
Sincerely, Philip Gemmer, President Given such evidence, we cannot hold that the takings of petitioner's land were so great as to afford petitioner the shelter of Masser. See Smith v. Commissioner,56 T.C. 1249 (1971), affd. 459 F. 2d 1043 (4th Cir.1972). Whatever Gemmer may have alleged at trial, his letter of February 1, 1968, must obviously take precedence. It was written when the events in question were occurring. Although petitioner may not invoke section 1033 to defer gain on all its property at the Winslow Street facility, it certainly has the right to defer gain on individual parcels of that land actually under threat of condemnation. Unfortunately, the record is sketchy on the effect of section 1033 on individual parcels of petitioner's land. It is clear, however, that the triangular tip of land at the corner of Winslow and Bedford Streets was under threat of condemnation. Both Gemmer and Mitchell testified to this; that testimony was credible. Accordingly, petitioner may invoke section 1033 to defer gain on this triangular tip of land. *273 [4] The same cannot be said for the strip of land on Bedford Street in front of petitioner's main building. It is unclear from the record precisely when the modification of Bedford Street was first proposed. Accordingly, we do not think petitioner may defer gain on this parcel. The carport land was leased land, there is no evidence as to what happened to the carports themselves, nor is there any evidence that petitioner realized any gain from the loss of the carports. Obviously section 1033 cannot be invoked if there is no showing of gain since the purpose of this section is to defer gain. The second source of alleged threat was from the developing Portland campus of the University of Maine. The Portland campus was essentially a commuter campus which required an increasing amount of parking space. Petitioner alleges that it was threatened by agents of the university with condemnation of the Noyes lot, where it stored cars and trucks and maintained parking for its *274 own employees. Petitioner contends that the university wanted the Noyes lot for student parking. After a careful consideration of the entire record, we simply cannot find the necessary threat of condemnation. "Since petitioner did not have actual notice of, nor could [it] reasonably infer from the events which occurred, any undesirable, impending consequence, there could be no compelling reason for [it] to convert [its] property into cash." Warner v. Commissioner,56 T.C. 1126, 1137 (1971), affd. 478 F. 2d 1406 (7th Cir. 1973), cert. denied 415 U.S. 915 (1974). Both Francis McGuire, who worked for the University of Maine and Barnett Shur, who represented it as legal counsel, testified that they did not threaten petitioner's representatives with condemnation. McGuire made it clear to Gemmer on more than one occasion that the university was reluctant to use eminent domain because it did not fit the university's image. He also made it clear that the financial position of the university was not always sound. In fact, McGuire told Gemmer that the university would use eminent domain only if the property were to be used for a building *275 site, not for surface parking. Gemmer was aware that the university wanted the Noyes lot for surface parking. During McGuire's 28 years at the university, eminent domain was used only once, when Myron Finkelman refused to sell his property after he had promised to do so and after the university had made commitments with this promise in mind. We also note that the university did not itself have condemnation powers but had to rely on the governor. We once again return to Gemmer's letter of February 1, 1968, set out above. It is clear from the letter that even at this late date (nine months before it agreed to sell its main building to Farrar-Brown, Inc.) Gemmer was unsure of the university's plans. In this letter he tries to have McGuire agree that the university will purchase all or a portion of petitioner's land or none of it. On February 23, McGuire replied. Gemmer testified that he thought McGuire had, in his reply letter, finally threatened condemnation with the sentence: "It is also reasonable to assume that we will attempt to acquire separately your property north of Bedfore [sic] Street within two or three years, and sooner if you move your operation for other reasons. *276 " We do not think this sentence can be taken as a threat of condemnation. To begin with McGuire stated earlier in the letter that "[the] observations that follow do not reflect decisions of either President Young or our Board of Trustees, hence, they are subject to change." Given McGuire's reluctance to commit the university since his first meeting with Gemmer in 1965, we see no change in his position. Futhermore, the alleged threat says "attempt to acquire" not "to acquire." This is further evidence of McGuire's caution. He did not commit the university to anything. While condemnation need not be reduced to an absolute certainly, we cannot hold for petitioner on evidence such as this. Petitioner also introduced two other documents into evidence which deserve comment. The first is a copy of a report by the Portland City Council regarding expansion of the University of Maine in Portland. The report shows petitioner's entire property as part of a first stage expansion of the university. Gemmer received this report in December of 1966. This report alone certainly does not constitute a threat of condemnation. Murray v. Commissioner,T.C. Memo. 1965-148, *277 affd. 370 F. 2d 568 (4th Cir. 1967), cert. denied 389 U.S. 834 (1967). The second document is a summary of a meeting between representatives of the city of Portland and the University of Maine. In that report there is the following sentence: "There have been no verbal threats of eminent domain, although owners are conscious of it." Mere knowledge that an entity has the power to condemn is not sufficient. Rainier Companies, Inc. v. Commissioner,61 T.C. 68, 75-76 (1973), affd. in part and revd. in part, 538 F. 2d 338 (9th Cir. 1975). Petitioner alleges, in the alternative, that agents of the university may not have openly threatened condemnation but nevertheless made their message clear. We must reject this argument; it simply does not have sufficient support in the record. Rather we accept McGuire's testimony. The university wanted the Noyes lot and was willing to purchase it if petitioner offered it for sale, but it was not willing to tarnish its image in the community by condemning the lot merely for parking space. Decision will be entered under Rule 155. Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. This is the property which petitioner alleges was under "threat or imminence" of condemnation. It was in the area of Forest Avenue and Bedford and Winslow Streets.↩
3. The carports involved herein were on leased property. This was not the case in Masser where the land actually condemned was owned by the taxpayer. This opinion is not to be read as extending Masser as far as petitioner wants. We are merely saying that even if we look at the facts in a light most favorable to petitioner and assume that Masser↩ should be extended as far as petitioner wants, petitioner's argument still fails.
4. Unfortunately there is not sufficient evidence on the record to determine precisely how much gain should be deferred. We trust the parties can resolve this matter between themselves without further testimony.↩